[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-10840

_____

D.C. Docket No. 4:17-cv-00008-WTM-GRS

NAOMI ELLISON,

Plaintiff-Appellant,

versus

ST. JOSEPH'S/CANDLER HEALTH SYSTEM, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(June 13, 2019)

Before MARCUS and HULL, Circuit Judges, and WRIGHT,* District Judge.

HULL, Circuit Judge:

_____

*Honorable Susan Webber Wright, United States District Judge for the Eastern District of Arkansas, sitting by designation.

Plaintiff Naomi Ellison appeals the grant of summary judgment in favor of her former employer, Defendant St. Joseph's/Candler Health System, Inc. ("St. Joseph's"), in her employment discrimination lawsuit, in which she claimed that St. Joseph's terminated her employment in retaliation for complaining about race discrimination in the workplace. After careful review of the record and the parties' briefs, and with the benefit of oral argument, we affirm.

## I.  FACTUAL BACKGROUND

Because we are considering an appeal from the district court's grant of summary judgment to Defendant St. Joseph's, we will consider the facts and inferences to be drawn from the underlying facts in the light most favorable to Plaintiff Ellison. Hornsby-Culpepper v. Ware, 906 F.3d 1302, 1311 (11th Cir. 2018); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986).

### A.    St. Joseph's Hospital

St. Joseph's operates the St. Joseph's Hospital in Savannah, Georgia. The mission of St. Joseph's is to deliver exceptional service, to treat illness, and to promote wellness for all people. St. Joseph's expressly values compassion, quality, integrity, courtesy, accountability, and teamwork. To meet those goals and foster a "culture of excellence," St. Joseph's workers are required to comply with a "Co-Worker Compact."

2

Because this case involves the Co-Worker Compact, we review some of its provisions. Specifically, the Co-Worker Compact contains nine tenets to which all workers are expected to commit, including (1) demonstrating a sense of ownership towards their job; (2) engaging in appropriate behavior, such as treating everyone as the most important person in the hospital and rejecting rudeness; (3) treating co-workers as professionals and showing patience with their requests; (4) communicating with patients with courtesy, clarity, and care; (5) being mindful of a patient's sense of urgency and promptly responding to patient requests; and (6) making patients and their families comfortable while they wait for services. It is a fireable offense for a St. Joseph's worker to violate the Co-Worker Compact or to treat patients with less than the appropriate standard of care.

## B.    Ellison's Employment at St. Joseph's

In August 2013, St. Joseph's hired Plaintiff Ellison, who is black, to work as a non-licensed Patient Care Technician ("PCT") on the 7th Floor South unit of the hospital. The factual setting of Ellison's work matters here. Patients on the 7th Floor South are usually critically ill, as they had just left the neurological Intensive Care Unit. They are cared for by a "patient care team," which is comprised of registered nurses, PCTs, and a unit clerk. On the 7th Floor South, St. Joseph's has the capacity to treat up to 20 critically ill patients at a time and teamwork is highly important.

3

On the patient care team, the registered nurses are typically assigned five or six patients at a time. In turn, the non-licensed PCTs work under the registered nurses and assist them with patient care. And the unit clerk is responsible for monitoring, on screens from a desk in the nurse's station, the most critical of the patients, as well as alerting team members when any of the patients need attention, among other administrative tasks. The number of nurses and PCTs assigned to each shift would vary given the patient census. But, ideally, St. Joseph's would staff two PCTs to work on the 7th Floor South each shift.

More specifically, as a PCT, Ellison provided routine bedside care to these critically ill patients. Ellison's tasks included bathing, feeding, changing, and moving patients, as well as taking vital signs, cleaning soiled patients, and helping patients void. Ellison worked the night shift, that is from 7 p.m. to 7 a.m. During orientation, Ellison was given the Co-Worker Compact and the hospital explained it to her in great detail.

Each night shift, PCT Ellison was supervised directly by the designated "Charge Nurse" on duty, who was Rebecca Floyd at the times relevant to this case. Ellison was also under the supervision of Heather Heldreth, the Clinical Nurse Manager. Heldreth worked during the day, not the night. On a monthly basis, Heldreth personally witnessed Ellison's work at times because she would visit the 7th Floor South during the night shift.

4

Heldreth's supervisor was Dewey Winkler, the Director of Clinical Care. Winkler never witnessed Ellison's performance at work firsthand. Instead, Winkler relied on information from Ellison's Nurse Manager (Heldreth), Charge Nurse (Floyd), and other co-workers to learn about Ellison's performance.

## C.     Performance Review

In August 2014, about two months before the incidents involved in this case, Ellison, as a PCT, had a performance review. The hospital's review scores an employee from 1 to 5 in various performance categories, with the scores meaning: 1—"Consistently falls below standard," 2—"Occasionally falls below standard," 3—"Meets standard," 4—"Usually exceeds standard," and 5—"Always exceeds standard." Ellison's scores were all 3s except for in two areas. She received a 2 for "[p]romotes measures to improve system / departmental patient satisfaction / customer service and verbalizes personal accountability." She also received a 2 for this item:

> Customers and co-workers are treated in a courteous manner.
> - New patients are promptly welcomed with patient care items and oriented to the unit
> - Apologies are offered for unexpected delays
> - Call lights are answered promptly with message communicated to the appropriate person
> - Utilized GIfT will all interactions (Greet, Introduce, inForm, Thank)
> - Names and date on whiteboard 100% at beginning of the shift.

5

Ellison's performance review was thus only satisfactory, not excellent, and she did have two areas in which she occasionally fell below St. Joseph's standards. Of particular importance to this case, Ellison occasionally fell below the standard for courteous interaction with patients and her co-workers.

**D.    October 11 Incident**

On October 11, 2014, Ellison was the only PCT working the night shift on the 7th Floor South. During her shift, she was involved in an incident with Mary Gillingham, a registered nurse who was assigned to the same unit that night. Charge Nurse Floyd was also working that shift.

PCT Ellison explained that she was entering vital signs into a computer when Henrietta Cason, the administrative Unit Clerk on duty, called her on the floor's internal telephone to report that the patient in Room 734 was soiled and needed to be cleaned. Nurse Gillingham approached PCT Ellison and asked for help cleaning and changing the linens for the soiled patient. Ellison admits that she replied that she would be there in "two minutes" and then went to get clean linens from a closet.

When Ellison arrived to help with the patient in Room 734, Nurse Gillingham said that she no longer needed Ellison's help. Ellison left the patient's room, but Nurse Gillingham followed her out into the hallway. While in the hallway, Gillingham told Ellison twice: "I don't like working with niggers."

6

Although Nurse Gillingham denied making that statement to Ellison or ever using any racially derogatory terms at all, we accept Ellison's version of the events.

Immediately following the incident, Ellison reported Nurse Gillingham's use of the racial slur to Charge Nurse Floyd and asked to go home because she had a headache.  PCT Ellison also called the House Supervisor, Leslie Jones-Bennett, to tell her about Nurse Gillingham's racial slur and to ask to leave early because of her headache.  Jones-Bennett initially asked Ellison to finish her shift because she was the only PCT working on the 7th Floor South that night.  Jones-Bennett then spoke to Charge Nurse Floyd, who said: "[Ellison] might as well go home she's mad and not going to do any work tonight."  As a consequence, Jones-Bennett told Ellison that she could go home.  Once home, Ellison telephoned Winkler and Heldreth to report the incident with Nurse Gillingham, but neither answered their phones.

Meanwhile, shortly after Ellison left St. Joseph's Hospital, Charge Nurse Floyd (Ellison's supervisor) called Jones-Bennett to tell her what had happened. According to an e-mail written by Jones-Bennett, Charge Nurse Floyd relayed to her that, after Cason called Ellison about the soiled patient in Room 734, Ellison told Nurse Gillingham, "Your pt in 734 needs to be cleaned up."  Nurse Gillingham asked if Ellison was going to help her.  Ellison responded, "I'm doing my vitals" and left the nurse's station.

7

Some time later, Ellison returned and asked Nurse Gillingham if she needed help with the patient in Room 734.  After Gillingham said no, Ellison reportedly replied, "I'm not going to help you for the rest of the night."  Gillingham walked away and mentioned the incident to another nurse.  Ellison saw the two nurses talking and yelled down the hallway: "You['re] a liar."  Ellison denies that she shouted that Nurse Gillingham was a liar.  After the incident, Ellison asked to go home because of her headache.

The morning of October 12, Jones-Bennett e-mailed Heldreth and Winkler to report the incident between Ellison and Gillingham.  Jones-Bennett recounted the events as Charge Nurse Floyd had described them to her on the phone.  Jones-Bennett reported that, after hearing the whole story from Charge Nurse Floyd, she called Ellison and told her not to return to work until she spoke to her Nurse Manager (Heldreth).  Jones-Bennett did not mention Ellison's claim that Gillingham used the n-word.

In her October 12 e-mail, Jones-Bennett listed as potential witnesses to the incident: (1) Nurse Debra Lessard, (2) Unit Clerk Cason, (3) Nurse Gillingham, and (4) the family in Room 734, who came out into the hallway to see about the yelling.  In that same e-mail, Jones-Bennett reported further that the nurses had been putting up with Ellison's behavior since she arrived "but they tell me not to

report her as they are fearful of what she will do in retaliation." Jones-Bennett planned to send Ellison home anytime she saw her bullying co-workers.

### E.    Ellison's October 13 Meeting with Winkler

Ellison did not work on October 12 or 13 because she was not scheduled for shifts those days anyway. However, on October 13, Ellison returned to St. Joseph's Hospital and met with Winkler to discuss the incident. During this meeting, Ellison contends that she immediately reported Gillingham's racially charged statements. Winkler responded that he had known Gillingham for 20 years and that Gillingham "wouldn't say that." Ellison told Winkler that she did not want to work with Gillingham anymore. At the end of this first meeting, Winkler told Ellison to provide him with a written statement regarding the matter. Although she cannot remember exactly when, Ellison contends that she did submit a written statement to Winkler.[1]

### F.    The Investigation

After his October 13 meeting with Ellison, Winkler called Nurse Gillingham to learn what had happened. Nurse Gillingham told Winkler that she asked Ellison

---

[1] We pause briefly to note that Ellison contends that she specifically reported Nurse Gillingham's use of the n-word to (1) Charge Nurse Floyd, (2) House Supervisor Jones-Bennett, and (3) Winkler. All three deny that Ellison reported the racial slur when initially informing them of the October 11 incident. However, for purposes of this opinion, we will accept Ellison's version of the events, including that (1) Ellison reported the racial slur to each of them, and (2) Nurse Gillingham uttered the n-word twice during the October 11 incident.

to clean a patient, Ellison refused, and then Ellison later said she was not going to help Gillingham for the rest of the night because Gillingham was "hateful to her." Winkler asked Nurse Gillingham if she had said anything racially charged or inappropriate to Ellison, and Gillingham denied that she had. But Nurse Gillingham admitted that she had been generally derogatory to Ellison because she was mad at her.

Thereafter, Winkler directed Nurse Manager Heldreth to conduct an investigation into what happened between Ellison and Nurse Gillingham on October 11. Winkler told Heldreth to talk to everyone who had worked on 7th Floor South that night and have them report in writing what they heard or saw between Ellison and Gillingham. Winkler relied on Heldreth to collect as much information as she could about the incident.

Nurse Manager Heldreth investigated the October 11 incident by: (1) asking various employees who worked that night shift what happened between Ellison and Gillingham; (2) requesting written statements from those employees; and (3) reviewing the written statements provided.

For example, on October 16, 2014, Charge Nurse Floyd e-mailed a written statement to Heldreth, which described the October 11 incident consistently with Jones-Bennett's report in her October 12 e-mail. Charge Nurse Floyd did not mention that Gillingham used the n-word or said any racially derogatory term to

10

Ellison.  Nurse Floyd also reported that she had questioned Nurse Lessard and Nurse Courtney Jones about the October 11 exchange.  Both Nurses Lessard and Jones worked that night.  Nurse Floyd reported that Nurse Lessard and Nurse Jones said that they heard Ellison tell Gillingham not to ask her for any help for the rest of the night.[2]

## G.    Additional Complaints

Although Heldreth only asked for information regarding the October 11 incident, Charge Nurse Floyd also reported in that October 16 e-mail that many patients had complained about Ellison.  At least once a week, a patient would not let Ellison come in their room.  As Charge Nurse Floyd put it, "most patients [did] not want [Ellison] taking care of them."  For example, Nurse Floyd described a time when everyone at the nurse's station heard Ellison tell a male patient that she could not help him use the urinal because "his thing was to[o] small and he would have to use it in the bed."  The patient responded that he did not want to urinate in bed, but Ellison was adamant that she could not help him.  When Ellison left the patient's room, Nurse Floyd told her not to talk to the patient like that and another nurse went to help the man.

---

[2]On October 15, 2014, Nurse Gillingham e-mailed Heldreth to report her account of the October 11 incident with Ellison.  Nurse Gillingham's written statement was consistent with what she reported to Winkler during their discussion on October 13, but inconsistent with what Ellison told Winkler.  So again we accept Ellison's version of the events.

11

In addition, on October 14, 2014, Nurse Jada McNeely e-mailed Nurse Manager Heldreth because she was concerned about Ellison's conduct. While Nurse McNeely did not work the night shift on October 11, she nevertheless worked alongside Ellison on the night shift on other occasions. Before sending the October 14 e-mail, Nurse McNeely had reported Ellison's conduct to her nursing instructor Ashok Patel and resource coordinator Terria Manning. They told her to e-mail Nurse Manager Heldreth with her concerns because Heldreth was not on the 7th Floor South that often, so as to witness Ellison's work performance firsthand.

Nurse McNeely's e-mail reported that Ellison was (1) difficult to work with, (2) had a bad attitude about 75% of the time during shifts, and (3) had a very smart mouth. Nurse McNeely said it was hard to delegate simple tasks to Ellison because she was always negative and would not complete the tasks "a lot of the times" anyway. She also explained that Ellison never asked the nurses if they needed help with labs. Nurse McNeely reported an instance where she was busy doing her labs and called to ask Ellison to get an echocardiogram on a patient. Instead of helping, Ellison asked "why couldn't we do it" and then hung up the phone. Most concerning, Nurse McNeely said that Ellison would curse in patients' rooms and be "rough with them (turning, bathing, bp cuff, etc)." Patients complained to Nurse McNeely that Ellison did not talk to them nicely, was "mad" with them, and asked that she not send Ellison back in their rooms.

12

## H.    Ellison's October 25 Shift

On October 25, 2014, Ellison worked a night shift on the 7th Floor South. Because of Ellison's performance, Charge Nurse Floyd e-mailed Heldreth and Winkler that same day informing them that four patients had complained about Ellison's conduct.  First, a patient complained to Charge Nurse Floyd that Ellison treated him badly and felt that she was angry with him.  While the patient could not give Charge Nurse Floyd a specific example, he said "this occurs every time she takes care of me, she is rude, never speaks to me or answers me about anything, she moves things as if she's angry with me, acts as if she doesn't hear me, [and] she will not put anything back when she is finished."  The patient explained that Ellison acted as though he was bothering her.

Charge Nurse Floyd's e-mail informed Heldreth and Winkler about a second incident involving a different patient.  After the patient said she loved Ellison's scarf, Ellison responded, "I'll need to take it off because if it touches a patient I'll have to [throw] it in the trash."  In a third incident, Unit Clerk Cason told Ellison that another patient needed to be put on the bedpan.  About ten minutes later, Ellison was in the patient's room getting her blood sugar.  Nurse Shanelle Emery walked in the room to discover that Ellison had not yet put the patient on the bedpan.  Ellison then complained that she was not appreciated and told the patient that she was working by herself that night.  Nurse Emery then put the patient on

13

the bedpan. Finally, a fourth patient complained to Nurse McNeely that he felt as though Ellison was mad at him and she got "rough" when helping him move.

## I.    Winkler Terminates Ellison's Employment

Based on the information gathered during the investigation and the additional complaints received, namely the e-mails sent by Ellison's colleagues, Nurse Manager Heldreth determined that Ellison had violated the Co-Worker Compact and engaged in misconduct leading to multiple patient complaints. Heldreth cited Ellison as violating numerous provisions of the Co-Worker Compact, including: (1) "[w]ork to be part of the solution," (2) "look beyond your assigned task," (3) "do not say 'It's not my job,'" (4) "be accountable for completion of task[s]," (5) "stay focused," (6) "reject rudeness, cheerfully meet," (7) "show respect," (8) "conduct yourself as a professional," (9) "treat co-workers as professionals, show patience," and (10) "anticipate the patient's needs."

Heldreth filled out a Disciplinary Action Report ("DAR"), documenting that Ellison violated the Co-Worker Compact and received multiple patient complaints, which Heldreth had confirmed with the House Supervisor, Jones-Bennett.

Winkler reviewed all of the e-mails Heldreth collected during the investigation. Then, on October 29, 2014, Heldreth and Winkler met with Ellison.

14

Winkler explained that the purpose of the meeting was to give Ellison the opportunity to rebut or accept responsibility for the complaints made by her co-workers and patients and her involvement in the incident with Gillingham.

During the meeting, Winkler showed Ellison copies of the e-mails that her co-workers sent Heldreth, which contained the numerous complaints about her behavior as well as the employees' accounts of the October 11 incident. In response, Ellison denied every allegation and accusation made by her colleagues. Winkler then decided to terminate Ellison's employment because it was apparent that she had blatantly violated the Co-Worker Compact.

Nevertheless, because Winkler knew she had financial needs, Winkler gave Ellison his business card, on which he wrote the names of two people who worked at Suwanee Staffing Service and their telephone number. Winkler suggested that Ellison contact the company to see if they had any "sitter" positions available. Winkler explained that a "sitter" is someone who takes care of a patient at their home, strictly one-on-one. A sitter does anything from cooking to housekeeping, with an emphasis on personal care, not medical care. Winkler explained that Ellison had trouble working well on teams and that sitting did not require any teamwork because it was one-on-one individual care. Winkler hoped that Ellison would be good at taking care of an individual patient.

15

After Heldreth and Winkler signed Ellison's DAR, Winkler completed and signed a Change Request form, stating that Ellison was "[t]ermed for violation of coworkers compact."

On the day Ellison was fired, Heldreth talked to Nurse Lessard. Nurse Lessard said she was present during the argument between Nurse Gillingham and PCT Ellison on October 11, but she did not hear the n-word used by anyone. In line with what she had reported to Charge Nurse Floyd earlier, Nurse Lessard submitted a written statement saying that Ellison told Nurse Gillingham not to ask her for any help for the rest of the night.

## J.    Jeannette McKinnon

Ellison also alleged that, about a year earlier, around October 14, 2013, Nurse Gillingham was involved in a similar interaction with another black employee, Jeanette McKinnon. McKinnon was a PCT working at St. Joseph's Hospital when she was also fired after an incident with Nurse Gillingham. PCT McKinnon alleged that Nurse Gillingham called her a "nigger" after becoming frustrated with McKinnon's work.[3] PCT McKinnon immediately reported the racial slur to Charge Nurse Floyd, who said she would let the Nurse Manager, Alicia Motley, know what had happened.

---

[3]While Nurse Gillingham denies calling McKinnon the n-word, we accept as true that the record evidence, including McKinnon's declaration, shows that Gillingham used the racial slur.

16

In an October 17 e-mail, Charge Nurse Floyd informed Nurse Manager Motley about the incident with Nurse Gillingham and PCT McKinnon. She first explained that Nurse Gillingham had been asking McKinnon to do things all shift, but ended up doing the tasks herself. The tension between the two came to a head when PCT McKinnon physically threatened Nurse Gillingham. McKinnon told Nurse Gillingham that she would "smash her face in," and began to approach her. Unit Clerk Cason[4] moved between the two women to protect Nurse Gillingham and yelled at McKinnon to back off. At this point, McKinnon had her arms up with her fingers pointed, and was swearing, yelling, and lunging at Nurse Gillingham. McKinnon eventually backed off and was sent home.

The day after the confrontation, Charge Nurse Motley called McKinnon and asked for a written statement about everything that had happened. The matter was referred to the human resources department.

On October 21, McKinnon was called in for a meeting with Nurse Manager Motley and a human resources representative. During the meeting, McKinnon was told she was fired for violent behavior toward a co-worker. In turn, McKinnon's DAR states that she was fired for violating the prohibition of violence in the workplace and for inappropriate behavior and threatening comments towards a co-

---

[4]Unit Clerk Cason filed a declaration in this case, which included a contemporaneous statement she wrote recounting McKinnon's actions (described above) and why she stepped in to protect Nurse Gillingham.

17

worker. It was signed by Nurse Manager Motley and Laura Woods, a human resource representative. Notably, McKinnon never said, or even alleged, that Winkler was involved in the investigation or the decision to terminate her employment.

## II. PROCEDURAL HISTORY

On January 5, 2015, Ellison filed a charge with the Equal Employment Opportunity Commission ("EEOC"), alleging unlawful race discrimination and retaliation. After receiving her right-to-sue letter, Ellison filed suit in Georgia state court, claiming that Defendant St. Joseph's fired her in retaliation for reporting racial discrimination at the hospital in violation of Title VII, 42 U.S.C. § 2000e-3(a) and 42 U.S.C. § 1981. On January 17, 2017, St. Joseph's properly removed the case to the federal district court in the Southern District of Georgia. Following discovery, St. Joseph's moved for summary judgment, which the district court granted, finding that Ellison had failed to rebut each of St. Joseph's reasons for terminating her as pretextual. This is Ellison's appeal.

## III. STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo. Lewis v. City of Union City, 918 F.3d 1213, 1220 n.4 (11th Cir. 2019) (en banc). Summary judgment is appropriate only when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a);

18

Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 2252 (1986).

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Hornsby-Culpepper, 906 F.3d at 1311 (quoting Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356).

## IV.  DISCUSSION

### A.    Retaliation Claims under Title VII and Section 1981

Title VII and § 1981 prohibit retaliation against an employee by an employer for engaging in statutorily protected activity.  42 U.S.C. § 2000e-3; Bryant v. Jones, 575 F.3d 1281, 1307–08 (11th Cir. 2009) (explaining that the elements to establish a retaliation claim under Title VII and § 1981 are the same).  Title VII's anti-retaliation provision prohibits an employer from retaliating against an employee "because [she] has opposed any practice made an unlawful employment practice" by Title VII, such as discrimination on the basis of race.  42 U.S.C. § 2000e-3(a).  The purpose of this anti-retaliation provision is to "prevent[] an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees," including securing a workplace where individuals are not discriminated against based on their race. Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 63, 126 S. Ct. 2405, 2412 (2006).

19

Absent direct evidence of discrimination, when analyzing race-based retaliation claims, we employ the analytical framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973), as modified in Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089 (1981). Bryant, 575 F.3d at 1307. Under this framework, a plaintiff alleging retaliation must first establish a prima facie case by showing that "[s]he engaged in statutorily protected activity, [s]he suffered a materially adverse action, and there was some causal relation between the two events." Goldsmith v. Bagby Elevator Co., 513 F.3d 1261, 1277 (11th Cir. 2008) (citing Burlington, 548 U.S. at 53, 126 S. Ct. at 2410–16). "These three elements create a presumption that the adverse action was the product of an intent to retaliate." Bryant, 575 F.3d at 1308.

"Once a plaintiff establishes a prima facie case of retaliation, the burden of production shifts to the defendant to rebut the presumption by articulating a legitimate, non-discriminatory reason for the adverse employment action." Id.; see also Goldsmith v. City of Atmore, 996 F.2d 1155, 1163 (11th Cir. 1993). To satisfy that burden of production, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." Burdine, 450 U.S. at 254–55, 101 S. Ct. at 1094 (citation and footnote omitted). "'If the defendant carries this burden of production, the

20

presumption raised by the prima facie case is rebutted,' and 'drops from the case.'" Bryant, 575 F.3d at 1308 (quoting Burdine, 450 U.S. at 255 & n.10, 101 S. Ct. at 1094-95 & n.10).

"After the defendant makes this showing, the plaintiff has a full and fair opportunity to demonstrate that the defendant's proffered reason was merely a pretext to mask discriminatory actions." Bryant, 575 F.3d at 1308. If the defendant's proffered reason is one that might motivate a reasonable employer, "an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc). To establish pretext, a plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (internal quotations omitted). "If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment." Chapman, 229 F.3d at 1024–25.

To begin, we assume for purposes of this appeal that Ellison has established a prima facie case of retaliation. In its motion for summary judgment, St. Joseph's

proffered two legitimate, non-discriminatory reasons for firing Ellison: (1) complaints about her treatment of the critical care patients; and (2) complaints about her inability to work with others on the patient care team, that is her conduct that violated the Co-Worker Compact. As an employer's burden of production at this step is "exceedingly light," Turnes v. AmSouth Bank, NA, 36 F.3d 1057, 1060–61 (11th Cir. 1994), we agree with the district court that St. Joseph's satisfied its burden of articulating a legitimate, non-discriminatory reason for Ellison's termination. This remains true despite the subjective nature of St. Joseph's conclusion that Ellison violated the various provisions of the Co-Worker Compact because that determination was based on a clear and reasonably specific factual basis.[5] See Chapman, 229 F.3d at 1034 ("A subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which it based its subjective opinion."). It is undisputed that Ellison's problematic interactions with her colleagues are expressly set forth in detail in the e-mails Heldreth collected during her investigation.

---

[5]Although Ellison conceded in the district court that St. Joseph's met its "slight burden of producing a legitimate, nonretaliatory reason for terminating Ms. Ellison's employment," she now argues for the first time on appeal that St. Joseph's did not meet that burden because of the subjective nature of its conclusion that she violated the Co-Worker Compact. Generally, we do not consider arguments raised for the first time on appeal, but Ellison's claim in this regard is meritless in any event. See Access Now, Inc. v. Sw. Airlines Co., 385 F.3d 1324, 1331 (11th Cir. 2004).

22

**B.    Whether Ellison Has Demonstrated Pretext**

Accordingly, the primary question on appeal is whether Ellison has sufficiently shown that St. Joseph's proffered reasons for her termination were pretextual and the real reason was in retaliation for complaining about Gillingham's racially discriminatory statements.  To answer that question, our "highly focused" task is to view all of the evidence to determine whether Ellison has "cast sufficient doubt on [St. Joseph's] proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that [St. Joseph's] proffered legitimate reasons were not what actually motivated its conduct."  See Combs, 106 F.3d at 1538 (internal quotations omitted).  For the reasons discussed below, we conclude that Ellison has failed to create a genuine issue for trial with regard to pretext.

1.  Complaints from Critical Patients about Ellison's Care

As we have explained, St. Joseph's articulated that it terminated Ellison's employment because of the complaints it received from patients regarding Ellison's care.  Specifically, several critical care patients, who had just left St. Joseph's neurological Intensive Care Unit, complained that Ellison was disrespectful, angry with them, treated them badly, and was "rough" when helping them move, among other things.  Patients asked that Ellison not be allowed back in their rooms.  Although Heldreth received the patient complaints via e-mail from two different nurses, Charge Nurse Floyd and Nurse McNeely, she took the

23

additional step of confirming them with the House Supervisor, Jones-Bennett, before citing the patient complaints in Ellison's DAR. And Winkler took these complaints into account when he fired Ellison.

This proffered reason for Ellison's termination clearly meets the test of being one that might motivate a reasonable employer. See Chapman, 229 F.3d at 1030. St. Joseph's mission is to deliver exceptional service in its treatment of patients at St. Joseph's Hospital. Mistreating and being disrespectful to several critically ill patients, such that they did not want Ellison to care for them at all, is a manifestly reasonable basis to terminate her employment.

Ellison attempts to rebut this explanation by arguing that Winkler did not honestly believe the patient complaints against her because, after firing her, he gave the phone number of a "sitting" agency that might hire her for patient care purposes. Ellison also submits that her employment evaluation conducted by Heldreth and Winkler two months before her termination showed that she was performing satisfactorily in terms of patient satisfaction and customer service. And prior to the October 11 incident, she had never received any written disciplinary action regarding her performance.

None of the evidence Ellison offered rebuts St. Joseph's articulated non-discriminatory reason. Concerning Winkler's suggestion that Ellison contact the "sitting" agency for potential employment, the evidence shows that the position of

24

a sitter is markedly different than the position of a PCT working on a patient care team. As a sitter, Ellison would work one-on-one with a patient who was well enough to be at home, not in the hospital, with an emphasis on personal care, not medical care. In contrast, as a PCT, Ellison worked on a patient care team, taking care of medically critical patients who had just left the Intensive Care Unit. Further, as a PCT, Ellison was required to assist nurses with their medical care of patients, in addition to providing routine bedside care.

We therefore conclude that it is not inherently contradictory that Winkler fired Ellison due to patient complaints about her care at St. Joseph's Hospital, while also providing her with contact information for a "sitting" position caring for patients in the entirely different setting of at-home, one-on-one care. Indeed, Winkler knew that Ellison had worked in patient care for many years before joining St. Joseph's Hospital and had the credentials to work as a sitter. Winkler explained that, while Ellison's employment at St. Joseph's Hospital did not work out because she was having trouble working well on the patient care teams, he hoped that she would be good at taking care of an individual patient in the context of one-on-one care. At the same time, aside from giving her the contact information for the sitting agency, Winkler did not recommend Ellison for the sitter position or otherwise help her get the job. Providing Ellison with contact information for a potential employer is hardly a ringing endorsement of Ellison,

25

nor does it contradict that Winkler honestly believed that patients at St. Joseph's Hospital had complained about Ellison's performance as a PCT.

Moreover, the evidence of Ellison's annual performance does not rebut that Winkler honestly believed the patient complaints about Ellison's performance that led to her termination. As explained earlier, that performance review was overall satisfactory, not excellent, and Ellison did receive two 2s, including for treating patients and co-workers in a courteous manner. In any event, when an employer asserts that it fired the plaintiff for poor performance, it is not enough for the plaintiff to show that her performance was satisfactory. See Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1266 (11th Cir. 2010). Rather, Ellison must demonstrate that Winkler did not believe the patient complaints about her performance and merely used that claim as cover for retaliating against her for reporting race discrimination at the hospital. Ellison has not made any such showing. Instead, the record establishes that two different nurses reported the patient complaints to Heldreth, and Heldreth verified the complaints with Jones-Bennett, the House Supervisor. Winkler in turn relied on that information about the patient complaints. While Ellison was adamant that the patient complaints were false and she never mistreated patients, she has not refuted that Winkler believed the patient complaints, nor has she shown that Winkler's concern about the patient complaints was merely pretext, with retaliation being the real reason for

her termination. See id. ("The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs . . . The question is whether her employers were dissatisfied with her for . . . non-discriminatory reasons, even if mistakenly or unfairly so, or instead merely used those complaints . . . as cover for discriminating against her." (citation omitted)).

We acknowledge that Unit Clerk Cason said in her declaration that the patient complaints about Ellison were so egregious that, if such interactions with patients had occurred, Ellison would have been immediately disciplined or fired. But we do not see how that evidence creates a triable issue of fact as to pretext because, after Winkler learned of these specific patient complaints, he in fact terminated Ellison's employment.

2. Complaints From Ellison's Co-Workers

St. Joseph's second proffered non-discriminatory reason for terminating Ellison's employment is that it received complaints about her inability to work with others on the patient care team—that is, her violations of the Co-Worker Compact. On that point, it is undisputed that, in investigating the October 11 incident, Heldreth received complaints from multiple nurses about Ellison's conduct. Specifically, the complaints reported that Ellison: (1) was difficult to work with, (2) had a bad attitude about 75% of the time during shifts, (3) had a smart mouth, (4) negatively responded to tasks delegated from nurses and often did

27

not complete the tasks anyway, (5) refused to help nurses when asked, (6) never asked nurses if they needed help with labs, and (7) bullied nurses. Based on these reports, Heldreth concluded that Ellison had violated several provisions of the Co-Worker Compact, including: (1) "[w]ork to be part of the solution," (2) "look beyond your assigned task," (3) "do not say 'It's not my job,'" (4) "be accountable for completion of task[s]," (5) "stay focused," (6) "reject rudeness, cheerfully meet," (7) "show respect," (8) "conduct yourself as a professional," (9) "treat co-workers as professionals, show patience" and (10) "anticipate the patient's needs." Winkler relied on Heldreth's determination in firing Ellison. This second proffered reason for firing Ellison also meets the test of one that might motivate a reasonable employer. See Chapman, 229 F.3d at 1030.

Nonetheless, Ellison contends that she proffered sufficient evidence to permit a reasonable jury to disbelieve that Winkler's decision to fire her was motivated by the nurses' complaints about her conduct that violated the Co-Worker Compact. In particular, Ellison argues that (1) Heldreth "overstated" the violations, which had no identifiable reference point in the e-mailed complaints, (2) Ellison's prior performance review was satisfactory, and (3) she had not previously received any written disciplinary action about her performance.

We find these arguments to be unpersuasive. Heldreth's conclusion that Ellison violated the Co-Worker Compact flows directly from, and is supported by,

28

the complaints Heldreth received in the e-mails. At any rate, which of those complaints establish which specific violations of the Co-Worker Compact is not an issue for this Court to referee. See Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1092 (11th Cir. 2004) ("Whether [the plaintiff's] conduct was insubordinate is not an issue for this Court to referee."). Our sole concern is whether unlawful retaliation motivated the decision to terminate Ellison's employment. In that regard, Ellison has provided no evidence to show that Winkler did not honestly believe either her colleagues' complaints or Heldreth's conclusion that she violated the Co-Worker Compact. See Silvera v. Orange Cnty. Sch. Bd., 244 F.3d 1253, 1259–61 (11th Cir. 2001) (finding no pretext because the plaintiff failed to refute defendant's belief, whether or not mistaken, which explained defendant's actions).

It is true that Winkler relied on Heldreth to identify the provisions of the Co-Worker Compact that Ellison violated, but Winkler was not required to conduct a separate analysis himself. Winkler reasonably relied on Heldreth—who was his immediate subordinate and Ellison's supervisor—to conduct that analysis for St. Joseph's. See Hawkins v. Ceco Corp., 883 F.2d 977, 980 n.2 (11th Cir. 1989) (explaining that an employer properly relied on his immediate subordinate's report about an employee's insubordination and did not need to conduct an independent investigation himself). In addition, as discussed above, evidence of Ellison's past satisfactory performance is not sufficient to show that Winkler did not believe the

29

various complaints about Ellison's performance and merely used that claim as a cover for retaliation.

### 3.  Whether St. Joseph's Investigation Was Flawed

As to both of St. Joseph's articulated reasons for her termination, Ellison argues that they were pretextual because the investigation from which the complaints were derived was flawed.  More particularly, Ellison alleges that the investigation was flawed because (1) Heldreth never personally questioned Ellison about the Gillingham incident, (2) Unit Clerk Cason did not provide a statement, (3) Heldreth solicited negative statements about Ellison that were not related to the October 11 incident, and (4) St. Joseph's failed to follow its own policies in terminating her employment.  We do not agree.

None of Ellison's criticisms of the investigation considered separately or together show that the investigation was unfairly conducted, or at a minimum so unfairly conducted that it should be considered evidence of pretext.  First, although Heldreth did not personally interview Ellison about the October 11 incident, Winkler did interview Ellison about it during their October 13 meeting.  During that meeting, Ellison told Winkler that Nurse Gillingham had used the n-word, and Winkler asked Ellison to provide him with a written statement, which she later submitted.  Similarly, after the incident, Gillingham spoke with Winkler about what had happened and submitted a written statement.  Because Ellison and

Gillingham were treated the same in the course of St. Joseph's handling of the incident, we do not see how Heldreth's not personally interviewing Ellison shows that the investigation was flawed or unfair.

And although Heldreth did not obtain statements from each and every employee working at the time of October 11 incident, she did obtain information from House Supervisor Jones-Bennett, Charge Nurse Floyd, Nurse Lessard, and Nurse Jones. That said, we recognize Ellison complains that Heldreth never asked Unit Clerk Cason about the incident. However, Ellison produced no evidence to show that Unit Clerk Cason was present to witness the incident between Nurse Gillingham and Ellison in the first place. In fact, in her declaration, Unit Clerk Cason provided no firsthand testimony corroborating Ellison's version of the October 11 incident or otherwise recounting the incident at all. Instead, Cason stated that she heard from two unnamed PCTs two days after the incident that Nurse Gillingham had called Ellison the n-word and that Ellison had been suspended. Given that Ellison was the only PCT on duty on the 7th Floor South for the October 11 night shift, any knowledge by those two PCTs was not even firsthand knowledge either. Without Cason's having any firsthand knowledge of the incident, we cannot say that Heldreth's not asking Unit Clerk Cason about it rendered the investigation so unfair as to show pretext.

31

Moreover, there is no record evidence to support Ellison's contention that Heldreth instructed Nurse McNeely and Charge Nurse Floyd to "dig up every piece of dirt" on Ellison. Instead, it is undisputed that Nurse McNeely had initially expressed her concerns about Ellison's conduct to her nursing instructor Patel and resource coordinator Manning. Both told Nurse McNeely to e-mail her concerns to Heldreth, who of course was Ellison's supervisor. As for Charge Nurse Floyd, there is no evidence that Heldreth asked her to submit a written statement about the patient complaints or otherwise dig up dirt on Ellison. Because Ellison's allegation in this regard is unsupported, it is not sufficient to create a genuine issue of fact. See Ellis v. England, 432 F.3d 1321, 1326 (11th Cir. 2005) ("[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion.").

In addition, Ellison has offered no evidence to show that Winkler was required to refer the investigation of the October 11 incident to St. Joseph's human resources department. First, Ellison has not demonstrated that she was placed on administrative leave while the hospital investigated the incident, as she came back to work. But even if there is a fact issue as to whether she was subject to administrative leave, Ellison has not shown that Winkler was required to refer the matter to human resources anyway.

32

It is true that St. Joseph's Administrative Policy on Discipline requires consultation with the human resources department when employee misconduct is subject to progressive discipline, i.e., first, a verbal warning, then a written warning, followed by suspension, and eventually discharge. But there is a special exception to that rule for when the misconduct at issue is so egregious that, when disciplined, the employee is subject to immediate termination, rather than going through the steps of progressive discipline.

According to Winkler, Ellison's conduct that violated the Co-Worker's Compact triggered this special exception. Consequently, when Ellison was disciplined, she was immediately fired. Because Ellison was not subject to progressive discipline, Winkler was not required to involve the human resources department. Ellison has not, therefore, offered any evidence to show that St. Joseph's actually violated applicable policies. For all of these reasons, Ellison has failed to show that the manner in which St. Joseph's investigated the October 11 incident establishes that the hospital's stated reasons for her termination were pretext.

4. Whether the McKinnon Incident Establishes Pretext

Ellison also argues that the evidence of the McKinnon incident—during which, a year earlier, Gillingham called McKinnon the racial slur—is similar to her experience and constitutes evidence of pretext. We agree that it is troubling that

33

another PCT reported to St. Joseph's that Gillingham called her a racial slur and then was fired soon thereafter. But the reasons for McKinnon's firing were considerably different from Ellison's. McKinnon was fired because she physically threatened Nurse Gillingham. Indeed, she violated St. Joseph's prohibition of violence at the workplace, engaged in inappropriate behavior, and threatened a co-worker. Unit Clerk Cason's statement attached to her declaration confirms that she had to step in between them to protect Nurse Gillingham.

In any event, we conclude that this evidence does not create a triable issue in this case because the decisionmakers who fired McKinnon were not the same as the decisionmakers who fired Ellison. See Goldsmith, 513 F.3d at 1286 (holding that co-worker testimony that an employer retaliated and discriminated against them is admissible under Fed. R. Evid. 404(b) to prove the same decisionmaker's motive, intent, or plan to discriminate or retaliate against the plaintiff).

Ellison does not dispute that the incident between McKinnon and Gillingham was initially investigated by Nurse Manager Motley and then handled with the St. Joseph's human resources department. McKinnon said as much herself, explaining that she was fired during a meeting with a human resources department representative and Motley, both of whom signed her DAR. Winkler was not present during that meeting and did not sign McKinnon's DAR. In

34

contrast, it was Winkler who decided to fire Ellison based on Heldreth's recommendation, and both Heldreth and Winkler signed Ellison's DAR.

Despite Ellison's suggestion otherwise, the fact that Winkler, in his capacity as Department Director, signed an administrative Change Request form as to McKinnon does not raise the inference that he was involved in the investigation or decision to terminate McKinnon or otherwise knew that Gillingham had called McKinnon the n-word. The Change Request form itself shows that Nurse Manager Motley sought McKinnon's termination on the basis that she violated the prohibition against workplace violence. Further, even though Winkler was copied on an October 17, 2013, e-mail about the McKinnon incident, the e-mail also did not report that Gillingham called McKinnon a racial slur. This is consistent with Winkler's statement that he had no knowledge about any race issue involving McKinnon at St. Joseph's Hospital.

Importantly too, Ellison has not produced any evidence showing that the incident with McKinnon demonstrates that Heldreth and Winkler did not honestly believe the numerous complaints about Ellison's mistreatment of patients or the complaints about her inability to work in a team with co-workers, specifically, the nurses caring for critically ill patients in the 7th Floor South unit of the hospital. We therefore conclude that no inference of pretext is available on the basis of the facts surrounding McKinnon's termination.

35

## V.  CONCLUSION

Based on the foregoing, we conclude that Ellison failed to produce evidence sufficient to permit a reasonable factfinder to disbelieve St. Joseph's proffered non-discriminatory explanation that it terminated Ellison's employment because of patient complaints about her treatment and her conduct that violated the Co-Worker Compact.  Because Ellison has failed to rebut the non-discriminatory reasons for her termination, a jury cannot reasonably conclude from the facts that St. Joseph's fired her in retaliation for reporting racial discrimination.  Therefore, we affirm the district court's grant of summary judgment in favor of Defendant St. Joseph's.

**AFFIRMED.**